NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No. NC-12-1085-PaMkH |
| | ) |
| JOSHUA P. PAGNINI and TENEIL A. PAGNINI, | ) Bankr. No. 10-70394 |
| | ) |
| Debtors. | ) Adv. Proc. No. 10-4393 |
| _____ | ) |
| | ) |
| ANTIOCH COMMUNITY FEDERAL CREDIT UNION. | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| JOSHUA P. PAGNINI; TENEIL A. PAGNINI, | ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

Argued and Submitted on October 18, 2012,
at San Francisco, California

Filed - November 13, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Edward Jellen, Bankruptcy Judge, Presiding[2]

_____

Appearances:    Laurel Adams argued for appellant Antioch Federal
Credit Union; Ronald B. Bass argued for appellees
Joshua P. Pagnini and Teneil A. Pagnini.

_____

Before: PAPPAS, MARKELL and HOLLOWELL, Bankruptcy Judges.

_____

[1]   This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value. See 9th
Cir. BAP Rule 8013-1.

[2]   Judge Jellen retired from service after entering the
judgment and order at issue in this appeal.

-1-

Appellant Antioch Community Federal Credit Union ("Antioch") appeals the decision of the bankruptcy court denying its request for a declaration that a debt owed to Antioch by chapter 7[3] debtors Joshua P. Pagnini ("Pagnini") and Teneil A. Pagnini (together, "Debtors") was excepted from discharge under § 523(a)(2)(A).[4]  We AFFIRM.

**FACTS**

This dispute concerns an alleged oral misrepresentation made by Pagnini to Antioch in connection with the refinancing of a loan secured by a 2006 Bentley automobile.  Unless otherwise noted, the facts are not disputed.

Loan History

Pagnini is CEO of Pagnini, Inc., and is involved in the environmental erosion control and construction site recycling business.  He also buys and sells vintage cars.  Antioch financed a number of Pagnini's vehicle purchases.

At a date not in the record, Pagnini borrowed funds from Antioch to acquire a 1940 Cadillac LaSalle ("Loan 13").  Pagnini

_____

[3]  Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as Civil Rules.

[4]  The bankruptcy court also concluded that Antioch had not shown it was entitled to an exception to discharge under § 523(a)(2)(B).  And, on its own initiative "in the interest of a complete record," the court also found that the elements for an exception to discharge under § 523(a)(6) had not been established. Decision at 8-10.  Antioch has not appealed those rulings, and we do not consider them, although we are skeptical about the propriety of the bankruptcy court, without request by the creditor, of offering an advisory opinion concerning an exception to discharge.

-2-

granted Antioch a security interest in the La Salle. The amount of the loan is not disclosed in the record.

In August 2004, Pagnini borrowed $27,000 from Antioch to purchase a 1950 Ford ("Loan 14"). The loan was secured by the Ford.

In March 2006, Pagnini borrowed $178,990 from Antioch to acquire a 2006 Bentley ("Loan 21"). The loan was secured by the Bentley.

In February 2008, Pagnini refinanced the balances due on Loans 13 and 14 with a new loan for $35,154 ("Loan 15"); no new funds were advanced in this loan. The loan was secured by both the LaSalle and Ford.

On February 9, 2009, with the permission of Antioch, Pagnini sold the Bentley for $75,000. The sale proceeds were paid to Antioch directly and applied to Loan 21. Pagnini then refinanced the balance due on Loan 21 with a new loan in the amount of $67,732 ("Loan 43"); this loan did not include any new funds. Loan 43 was secured by the Ford, which Antioch released as the collateral on Loan 15. The value of the Ford, based on an appraisal submitted as part of the application to refinance Loan 21, was $38,200, meaning that approximately half the balance due on Loan 43 was unsecured.

Anna Tellez ("Tellez"), chief executive officer of Antioch, would later testify regarding the loan committee's deliberations in approving Loan 43:

> What I recommended to the board was that we accept the . . . $75,000, and that we would rewrite the loan. He had one loan outstanding that had two pieces of security, two cars that were collateralized, secured on that loan. And so that we could use the other as

security, as partial security on the difference, the deficit balance of the $75,000 — between the $75,000 and the $149,000 that he owed. And then the rest would be unsecured. And we would do it as a blended rate. When it was taken to the board, the board approved it, but they approved it with a cosigner[.]

Trial Tr. 70:1-13, November 13, 2011.

It was also undisputed that the 1950 Ford had been largely disassembled at the time it was offered to collateralize Loan 15 in 2008 and Loan 43 in 2009. According to Pagnini's testimony at trial, the disassembled Ford was also missing the engine, radiator and transmission, which he had sold.

Pagnini submitted an appraisal report concerning the Ford as part of the application to refinance Loan 21. The appraiser testified at trial that, in preparing this report, he did not physically examine the Ford, but instead simply asked Pagnini questions about the car on the phone. Pagnini told the appraiser that the Ford was in the same condition that it had been the last time the appraiser physically examined it in 2004. The appraiser was therefore unaware that the Ford was disassembled with three key component parts missing. He testified that if he had known that the Ford was in that condition, he would not have provided an appraisal report valuing the Ford at $38,200.

At some date not disclosed in the record, Pagnini defaulted on Loan 43.

The Adversary Proceeding

Debtors filed a chapter 7 petition on September 10, 2010. Debtors listed Antioch on Schedule D as a secured creditor owed $400,000 for "multiple loans on various vehicles."

-4-

Antioch filed an adversary complaint against Debtors[5] on December 14, 2010. It alleged that Pagnini had obtained Loan 43 from Antioch by false pretenses and fraud by providing a false appraisal, and by failing to advise Antioch that the Ford, the security offered for the refinance loan, was disassembled. These acts and omissions, according to Antioch, rendered the debt excepted from discharge under § 523(a)(2)(A). Debtors filed an answer generally denying the allegations of the complaint. However, Debtors admitted that the appraisal did not state that the Ford had been disassembled.

A trial in the adversary proceeding was conducted by the bankruptcy court on November 30, 2011. The court heard testimony from Ed Archer (the appraiser who prepared the appraisal report on the Ford), Pagnini, and Tellez. After closing statements, the bankruptcy court took the issues under submission.

The bankruptcy court entered a decision on December 14, 2011 (the "Decision"). In it, the court examined each of the five elements that a creditor must establish for an exception to discharge under § 523(a)(2)(A): (1) the debtor must make a misrepresentation, (2) with knowledge of its falsity, (3) with the intention and purpose of deceiving the creditor, (4) that the creditor relied on the representation, and (5) the creditor sustained damage as the proximate result thereof. See In re Britton, 950 F.2d 602, 604 (9th Cir. 1991). The bankruptcy court found that the first four elements had been established by Antioch. Neither party in this appeal has challenged the court's

---

[5] The parties would later stipulate to dismiss Teneil A. Pagnini as a defendant in this adversary proceeding.

-5-

rulings as to those four elements.

However, the bankruptcy court found that "the weight of the evidence did not show that Antioch suffered any damage as a proximate result of Paganini's concealment of the condition of the Ford. The fifth element of § 523(a)(2)(A) is therefore not satisfied." Decision at 7. The court reasoned that, applying Ninth Circuit case law, in order to show that Antioch's damages were proximately caused by Pagnini's fraud, Antioch must prove that it had valuable collection remedies at the time the subject loan was made, and that such remedies were lost as a result of the transaction. The bankruptcy court found that the only valuable collection remedy Antioch gave up in the subject transaction was its right to repossess and sell the Bentley. Tellez testified that if it had known of the actual condition of the Ford, Antioch would not have refinanced the Bentley loan, would not have allowed Pagnini to sell the Bentley, and would instead have repossessed the Bentley and sold it for more than $75,000. Decision at 7-8. The court found, however, that Antioch had failed to prove damages, because it did not offer any credible evidence to show that it could have received more than $75,000 had it repossessed and sold the Bentley. Decision at 8.

The bankruptcy court entered a judgment dismissing Antioch's complaint on December 14, 2011. Antioch filed a motion to alter or amend judgment under Civil Rule 59(e) on December 27, 2011. In the motion, Antioch argued that the judgment was against the weight of evidence because Tellez testified without contradiction that Antioch had been damaged by the fraud committed by Pagnini, and that Antioch had been deprived of valuable collection remedies

-6-

at the time of the loan renewal.

At a hearing on January 20, 2012, the bankruptcy court announced on the record that the motion would be denied, and that it would issue a written decision.  The court entered its Decision: Motion to Alter or Amend Judgment on January 24, 2012 ("Decision II").  In it, the bankruptcy court observed that Antioch had identified only one valuable collection right it allegedly lost as a result of the loan refinance, its right to repossess the Bentley, but Antioch had not shown how it would have benefitted by doing so as compared to allowing Pagnini to sell the Bentley for $75,000.  Decision II at 2.  The court rejected Antioch's argument that it could have foregone repossession and simply relied on Pagnini's incentive to repay the loan because it was contrary to the trial testimony and purely conjectural. Finally, the court found that Antioch's new argument that it would have charged a higher interest rate on Loan 43 if it had known the true value of the Ford lacked merit because it was simply not a collection right.  The court found Antioch's other arguments equally unpersuasive.  The court entered an order denying Antioch's Civil Rule 59(e) motion on January 24, 2012.

Antioch filed a timely appeal on February 7, 2012.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Whether the bankruptcy court clearly erred in determining that Antioch did not prove that Pagnini's alleged fraud was the proximate cause of any damages as required under § 523(a)(2)(A).

-7-

**STANDARD OF REVIEW**

A bankruptcy court's findings regarding proximate cause under § 523(a)(2)(A) may be reversed only if clearly erroneous. Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir. 1991) (explicitly examining proximate cause as an element of nondischargeability under § 523(a)(2)(A)). "Clearly erroneous review is significantly deferential, requiring that the appellate court accept the [trial] court's findings absent a definite and firm conviction that a mistake has been made." United States v. Syrax, 235 F.3d 422, 427 (9th Cir. 2000).

**DISCUSSION**

Section 523(a)(2)(A) provides that a debt will be excepted from discharge in bankruptcy "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To establish that a debt is not dischargeable under § 523(a)(2)(A), the Ninth Circuit holds that the creditor must prove five elements:

> (1) the debtor made . . . representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; [and] (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Ghomesh v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010) (citing Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996) (quoting Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir. 1991)). The creditor bears the burden of proving each of these

-8-

elements by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279 (1991); <u>Gill v. Stern (In re Stern)</u>, 345 F.3d 1036, 1043 (9th Cir. 2003).

In its analysis, the bankruptcy court correctly identified the <u>In re Britton</u> elements and ruled that Antioch had adequately established the first four. These rulings have not been appealed to this Panel and we do not review them.

However, the bankruptcy court decided that Antioch had not established the fifth element because the evidence did not show that Antioch suffered any damage as a proximate result of Pagnini's concealment of the true, disassembled condition of the Ford. In making this decision, the bankruptcy court relied on the Ninth Circuit's holding in <u>Stevens v. Nw. Nat'l Ins. Co. (In re Siriani)</u>, 967 F.2d 302 (9th Cir. 1992).

In <u>In re Siriani</u>, a creditor, Springbrook Lenders, lent money to a partnership owned in part by the debtors (including Bruce Siriani) to finance acquisition of an apartment building by the partnership. To obtain the loan, the debtors were required to provide a bond. The bonding company, Northwestern, required the debtors to execute an indemnity agreement. The indemnity agreement, <u>inter</u> <u>alia</u>, granted the bonding company a power of attorney to perfect a security interest. When the loan came up for refinancing, the loan company required renewal of the bond. The debtors submitted false financial documents to Northwestern, upon which the bonding company relied in renewing the bond.

The loan went into default, a claim was made on the bond, and the debtors failed to provide funds to cover that claim. However, Northwestern had not acted promptly to perfect its security

-9-

interest in the debtors' assets, and when an involuntary bankruptcy was filed against them, Northwestern was prevented from doing so. Northwestern filed an adversary proceeding in the bankruptcy court against the debtors, alleging that their indemnity obligation for amounts Northwestern had paid to honor the bond was a nondischargeable debt under § 523(a)(2)(B).[6]

The bankruptcy court in In re Siriani disagreed with Northwestern, holding that the bonding company was required to show that it had valuable collection remedies that had become worthless as a result of the debtors' fraud. On appeal, the Ninth Circuit stated:

> We agree with the bankruptcy court that Northwestern had to show that the fraud proximately caused its loss by adducing evidence that it relied on the financial statements, that it had valuable collection remedies at the time of renewal, and that such remedies lost value during the renewal period.

Two years after In re Siriani, this Panel faced a similar fact pattern and applied the In re Siriani rule. Cho Hung Bank v. Kim (In re Kim), 163 B.R. 157 (9th Cir. BAP 1994). In In re Kim, the debtors obtained a $110,000 loan to purchase a parcel of real estate that was being foreclosed. They purchased the foreclosed property, and then resold it to the debtors' sister and brother-in-law for $190,000. But instead of paying off the initial loan, the debtors sought a loan renewal from the bank (in the process, failing to inform the bank that the real property had

---

[6] Elsewhere in its decision, the Ninth Circuit notes that §523(a)(2)(A) and (a)(2)(B) are substantially similar, and that a bankruptcy court may apply the analysis regarding proximate cause to claims arising under either subsection of § 523(a)(2). In re Siriani, 967 F.2d at 304.

-10-

been sold), so they could use the funds from the sale to purchase a liquor store. When that business failed, and the debtors filed for bankruptcy, the bank's only valuable collection remedy that it might have exercised if it had discovered the fraud was to file a lawsuit in state court. However, the bank argued that remedy had declined in value with the filing of the bankruptcy case.

In connection with the bank's action against the debtors for a fraud exception to discharge, the Panel concluded that in order to prove the fifth element, proximate cause, that,

> if the creditor demonstrates that it had valuable collection remedies at the time of the extension or renewal, that it did not exercise in reliance on the debtor's misrepresentation and that those remedies lost value during the renewal or extension period, the creditor has shown proximate damage to the extent that those remedies lost value.

In In re Siriani, the creditor had a valuable collection remedy at the time of refinancing, the power to perfect its security interest, that declined in value when the bankruptcy filing prevented it from perfecting that interest. In In re Kim, the creditor had the power to sue the debtors in state court when the bank renewed the loan, but that power declined in value when the debtors filed the bankruptcy petition. Both these powers were "valuable collection remedies" that could have significantly reduced the creditors' loss. However, in this case, Antioch's sole collection remedy impacted by Pagnini's failure to reveal the true condition of the Ford when he refinanced Loan 21 was the creditor's potential right to repossess and sell the Bentley. The bankruptcy court found that Antioch had presented no evidence to show that, had it exercised that remedy, its eventual loss on the loan would have been reduced.

-11-

Indeed, to the contrary, the court had heard Tellez testify about that very point:

BENABOU [Counsel for Pagnini]: Ms. Tellez, so you indicated that you would have tried to have sold the Bentley if Mr. Pagnini couldn't have — you could have or you may have been able to sell it for more than $75,000, is that what your testimony is?

TELLEZ: Yes.

BENABOU: But you don't know that, do you?

TELLEZ: No, I don't. To say, honest — truthfully, no, I do not know that I can.

Trial Tr. 135:10-17, November 30, 2010. As can be seen, Tellez seemingly admitted that Antioch's one valuable collection right lost via the refinance transaction, the right to repossess and sell the Bentley, was not necessarily "valuable" at all. She could not say that by exercising that power, even if Antioch had been aware of Pagnini's misrepresentation, the results for Antioch would have in any way changed. Moreover, Pagnini testified without contradiction that Antioch's repossession of the Bentley would not have affected his ability to repay the unsecured portion of the loan. Thus, the bankruptcy court had multiple plausible views of the evidence, two from the same party, and its choice among them cannot be clear error. United States v. Elliott, 322 F.3d 710, 714 (9th Cir. 2003). The deference owed to the bankruptcy court on this choice is heightened because it is based on the credibility of live witnesses. Rule 8013.

Antioch has argued, both in the bankruptcy court and this appeal, that the bankruptcy court should have considered the actual damages it suffered resulting from Pagnini's misrepresentation. As discussed above, though, this argument is

-12-

simply inconsistent with the required analysis in Ninth Circuit case law regarding the fifth element, proximate cause. Even so, the bankruptcy court examined those arguments, and found that Antioch had not shown it suffered any actual damages resulting from the misrepresentation.

Antioch argued that the blended interest rate on the refinanced loan it made to Pagnini would have been higher if it had known that the Ford was disassembled. The bankruptcy court did not clearly err in finding that a changed interest rate was not a valuable collection remedy it lost for purposes of § 523(a)(2)(A). Appellant argued that following the refinancing, it received $13,441 less from Pagnini in the payment schedule for Loan 43 than it would have under the old payment schedule on Loan 21. Again, the court ruled this was not a collection remedy. Additionally, the court noted that the evidence produced by Pagnini was that he could not have paid the additional $13,441. Antioch argued that it lost money on the sale of the Bentley — again, not a collection remedy. The court also had evidence from Antioch that it approved the sale of the Bentley for $75,000 because it knew that this was the best offer that it would receive.

Finally, Tellez testified that a typical debtor is more likely to repay a secured loan than an unsecured loan. When it released the Bentley for sale, Antioch argued, Pagnini was less motivated to pay the remaining balance, and this caused Antioch damages. Again this contention does not go to collection remedies. It is also inconsistent with the testimony of Pagnini that he was actively trying to sell the Bentley and keep the Ford.

For all these reasons, in light of the deferential standard we apply to the bankruptcy court's findings regarding the proximate cause element of § 523(a)(2)(A), together with the heightened deference we give the court's decisions based on testimonial evidence, we conclude that the bankruptcy court did not clearly err in determining that Antioch did not prove it was entitled to an exception to discharge.

**CONCLUSION**

We AFFIRM the judgment of the bankruptcy court.